J-S20021-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| WILLIAM VAUGHN HOOPER, III | : | |
| | : | |
| Appellant | : | No. 1564 MDA 2024 |

Appeal from the Judgment of Sentence Entered October 4, 2024
In the Court of Common Pleas of Huntingdon County Criminal Division at
No(s): CP-31-CR-0000102-2023

BEFORE: OLSON, J., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY LANE, J.: **FILED: JULY 8, 2025**

William Vaughn Hooper, III ("Hooper") appeals from the judgment of sentence imposed following his convictions for three counts each of aggravated indecent assault of a child and indecent assault of a person less than thirteen years of age.[1]  We affirm.

Hooper's convictions resulted from acts of sexual abuse and assault that he committed against M.M., the granddaughter of his then-wife C.H. ("Grandmother"), between August 2010, and December 2012, when M.M. was between five and seven years old.  In 2021, while undergoing therapy, M.M. disclosed the sexual assaults to her therapist, who reported the assaults to Childline.  Following an investigation, police arrested Hooper and charged him with the above offenses.

---

[1] *See* 18 Pa.C.S.A. §§ 3125(b), 3126(a)(7).

The matter was scheduled for a jury trial to commence on January 8, 2024. When that date arrived, however, Hooper refused to leave his cell at the Centre County Correctional Facility ("CCCF") for transport to the Huntingdon County courthouse. As a result, the trial court continued the matter and rescheduled jury selection for the morning of March 4, 2024. On that date, during morning jury selection, Hooper verbally requested a continuance, referencing an *ex parte* letter he had sent to the trial court on January 21, 2024. In that letter, Hooper attempted to excuse his refusal to appear for jury selection on January 8 on the basis that he was unprepared for trial because defense counsel did not adequately meet with him or permit him to review discovery materials as often as he wished. Hooper additionally sought a continuance on the basis that he was required to leave his trial-related paperwork at the CCCF when he was transported to the Huntingdon County jail, as he was not permitted to bring anything with him during the transport. The trial court perceived the request as a delay tactic and denied a continuance. The trial then proceeded as rescheduled.

The trial court summarized the evidence and testimony presented at trial, as follows:

> During their marriage Grandmother and [Hooper] lived together at Grandmother's residence, located . . . in Smithfield Township, Huntingdon County. M.M. apparently often spent time at Grandmother's house, including overnight. M.M. did not have her own room at Grandmother's house, so when she slept over[,] she would either sleep on the couch or in Grandmother's and [Hooper's] shared bed. N.T., [3/7/24], at 10-13. At times, M.M.

would be watched solely by [Hooper], without Grandmother or anyone else present.  *Id*. at 13.

Grandmother's relationship with [Hooper] ended violently, after an incident that occurred at Grandmother's house [in] 2012. On that date, [Hooper] assaulted Grandmother in their home after an argument between the two.  The incident resulted in [Hooper's] conviction . . . of one count each of simple assault and terroristic threats.

M.M. witnessed the assault, and provided statements to Pennsylvania State Police troopers about what she had seen.  She did not, however, make any statements or disclosures to the troopers about having been sexually assaulted by [Hooper].

Approximately nine years later, in late 2021, M.M. was being treated by a therapist.  She became comfortable enough with the therapist that she opened up about what had occurred with [Hooper], and disclosed to the therapist that [he] had sexually assaulted her on multiple occasions.  [*Id*.] at 27-28.  M.M.'s therapist, as a mandated reporter, reported M.M.'s disclosures to Childline, leading to a criminal investigation and the instant case. *Id*. at 48-49.

Because of M.M.'s young age at the time of the sexual assaults, she did not recall the exact time or location of each incident.  Rather, she recalled specific details and then worked out the timing and location based on associated recollections.  For example, she knew that the assaults all occurred when she was between the ages of five and seven because her first memory of being at Grandmother's house was her fifth birthday party, when she received a kitten as a present.  *Id*. at 13.  She knew that they ended when she was seven because she specifically recalled the events of December 27, 2012 (when [Hooper] assaulted Grandmother), and she never saw [Hooper] again after that day. *Id*. at 28.  And while she did not remember the exact location of Grandmother's house, she remembered that there was a large, red and white "84" sign beside it.  *Id*. at 11-12.  M.M. recalled three assaults specifically[:]

- The first assault occurred at Grandmother's house, when M.M. was five, as it was not long after her fifth birthday party at the house.  She did not know the time of year, but recalled that it was cold enough that she could not play

- 3 -

outside. She was in the computer room, which was off the kitchen, and [Hooper] called her to come to the living room. [Hooper] was sitting on the recliner in a corner of the living room, watching baseball, and told M.M. to sit on his lap. When she did so, [Hooper] started reaching into her pants, and eventually began penetrating her vagina with his fingers. M.M.'s reaction was to "just lay there," because she did not know what was happening. *Id*. at 13-16. [Hooper] told her that "we weren't doing anything wrong and that this is normal." M.M.'s thoughts reflected her young age; "I knew it wasn't normal[,] but I didn't know that it was bad." *Id*. at 16. [Hooper] then sat M.M. down on the couch in the living room, which was located diagonally across from the recliner, and told her to masturbate in front of him. He used the word "masturbate," but M.M. did not know what it meant, so "he told me to just put my fingers in me." She did so, but was again confused by what was going on. *Id*. at 17. At some point before the incident ended, either after he stopped digitally penetrating her or after he told her to masturbate in front of him, [Hooper] also told M.M. that he would kill her if she said anything to anyone about what had occurred. *Id*. at 16, 18. M.M. did not remember how the assault ended, but remembered going back to the computer room after it was over and just sitting there, crying. *Id*. at 18. She did not tell anyone about what had occurred, as she believed [Hooper's] threats that he would kill her. *Id*. at 18-19

- The second assault occurred at [Hooper's] place of work, a garage that M.M. recalled was located near Huntingdon Borough, across from a grocery store. She believed that she was six years old when it happened, and that it happened "a good bit of time" after the first assault. *Id*. at 19, 21-22. She specifically remembered that she was wearing a "Monster High" shirt and skirt, which was pink and was one of her favorite outfits to wear when she was little. *Id*. at 21. She was spending the day with [Hooper], and the two went out to eat pizza at Domino's. She could not recall the time of year, only that "it wasn't cold[,] but it wasn't warm out either." *Id*. at 20. [Hooper] was driving a car that he needed to make repairs on, and after getting pizza, he drove it to the garage and pulled it inside. No one else was there. M.M. was sitting on a "spinning chair" as [Hooper] was working on the car, and [he] called M.M. over

to the car and told her to get into the back seat with him. She did so, and [he] began touching her vagina again, digitally penetrating her. As he was doing so, he reminded M.M. that "we weren't doing anything wrong." *Id*. at 20-21. M.M.'s primary reaction was again confusion, as she did not know why [Hooper] would be doing what he was doing to her, and it felt like the assault lasted a long time. When [he] was done, he again told M.M. that he would kill her if she told. anyone. They left the garage soon afterward. *Id*. at 21.

- The third and final assault happened when M.M. was seven. She believed it was either August or September, just after her birthday, as it was starting to get cooler outside. *Id*. at 22-23. This assault happened at Grandmother's house, when [Hooper] was watching M.M. alone. Typically[,] Grandmother would give M.M. a bath when she was staying at Grandmother's house, but on this occasion [Hooper] gave her a bath. In part, M.M. specifically remembered this occasion because earlier in the day she had cut her knee after wrecking her bicycle, and had a bandage covering the wound. Before putting her in the bath, [Hooper] ripped the bandage off, and M.M. cried when he did so because it hurt. [Hooper] washed M.M.'s hair while she was in the bath, and when she got out [Hooper] "put one of those towels around me with the head thing," and then gave her "a purple nightgown but no underwear." *Id*. at 23. M.M. asked [Hooper] why there was no underwear, and he did not respond. *Id*. at 24. [Hooper] went to his and Grandmother's bedroom while M.M. was getting dressed, and M.M. went to the bedroom, as that was where she was going to be sleeping that night. She laid in bed with [Hooper] and tried to go to sleep, "but I couldn't." The reason that she could not sleep was that [Hooper] began touching her vagina again, penetrating her with his fingers. M.M. did not remember how long the assault lasted this time, but remembered laying there upset. She was upset about: "the fact that it was supposed to be okay. He said it was okay but it didn't feel okay." *Id*. at 25. She did not recall [Hooper] saying anything to her as he was assaulting her, but did remember that afterward, he again told her that he would kill her if she told anyone. *Id*. Also, while she had not suffered any injury from the first two assaults, M.M.

remembered that there was blood in her underwear when she woke up in the morning. *Id*. at 25-26.

Trial Court Opinion, 1/15/25, at 1-5 (footnotes, some citations, and unnecessary capitalization omitted).

During closing arguments, the prosecutor made the following comments regarding M.M.'s delayed disclosure of the sexual assaults:

This is how sexual assaults occur. They're not just a random stranger. Statistically they're done by people that someone trusts, someone that's in their circle of trust, somebody that's in their family, a grandfather.

N.T., 3/7/24, at 5-6. No defense objection was made at the time of these comments or at any time during the closing arguments, nor during the trial court's subsequent instructions to the jury. Thereafter, while the jury was deliberating, defense counsel stated an objection on the record regarding the prosecutor's comments. However, counsel did not request any remedy or ask for a curative instruction.

At the conclusion of trial, the jury convicted Hooper of the above-referenced crimes. Following Hooper's convictions, a member of the Sexual Offenders Assessment Board ("SOAB") undertook an evaluation of Hooper and concluded that he is a sexually violent predator ("SVP").[2] The matter

---

[2] Under revised Subchapter H of the Sex Offender Registration and Notification Act ("SORNA II"), 42 Pa.C.S.A. § 9799.10 *et seq.*, after a person has been convicted of an offense listed in section 9799.14, the trial court orders an assessment by the SOAB. *See id*. § 9799.24(a). The SOAB must assess all individuals convicted of sexually violent offenses to determine whether they should be classified as an SVP. *See id*. § 9799.24(b).

proceeded to sentencing and, in June 2024, the trial court initially imposed sentence upon Hooper. Hooper then filed a post-sentence motion in which he, *inter alia*, challenged his sentence and claimed that the verdict was against the weight of the evidence. The trial court denied his weight challenge, but vacated his sentence and scheduled a resentencing hearing. On October 4, 2024, the trial court resentenced Hooper to an aggregate prison term of 234-720 months of incarceration. Hooper did not file a post-sentence motion. As the Commonwealth did not request an SVP hearing or determination, no such hearing took place, and the court did not make any SVP determination regarding Hooper. Hooper filed a timely notice of appeal, and both he and the trial court complied with Pa.R.A.P. 1925.

Hooper raises the following issues for our review:

1. The court erred in denying [Hooper's] request for a continuance on March 4, 2024, as materials necessary for [his] defenses were left behind at the [CCCF], where [he] was being housed prior to trial, when [he] was transported to Huntingdon County for jury selection that day.

2. The court erred in refusing to issue a limiting or cautionary instruction regarding statements made by the Commonwealth in closing regarding statistics showing that the majority of sexual assaults against children are committed by someone with whom the child has a close personal relationship.

3. The verdict was contrary to the evidence in that the evidence viewed in the light most favorable to the Commonwealth as the verdict winner and giving the Commonwealth the benefit of all reasonable inferences drawable therefrom did not establish any of the charges beyond a reasonable doubt based on a host of issues with M.M.'s testimony regarding the assaults.

J-S20021-25

> 4. The Court erred in not providing [Hooper] with funds for an
> expert witness to combat the SOAB's finding that he is [an
> SVP].

Hooper's Brief at 10-11 (unnecessary capitalization omitted).

In his first issue, Hooper challenges the trial court's denial of his motion

for a continuance. Our standard of review for a ruling on a motion to continue

is well-settled:

> The grant or denial of a motion for a continuance is within
> the sound discretion of the trial court and will be reversed only
> upon a showing of an abuse of that discretion. [A]n abuse of
> discretion is not merely an error of judgment. Rather, discretion
> is abused when the law is over-ridden or misapplied, or the result
> of partiality, prejudice, bias, or ill-will as shown by the evidence
> or the record. The grant of a continuance is discretionary and a
> refusal to grant is reversible error only if prejudice or a palpable
> and manifest abuse of discretion is demonstrated.

***Commonwealth v. Griffin***, 804 A.2d 1, 12 (Pa. Super. 2002) (internal

citations and quotation marks omitted). "In reviewing a denial of a

continuance, the appellate court must have regard for the orderly

administration of justice, as well as the right of the defendant to have

adequate time to prepare a defense." ***Commonwealth v. Wesley***, 753 A.2d

204, 215 (Pa. 2000).

Hooper contends that he "sought to continue his jury selection because

staff at the [CCCF] refused to permit him to take his legal paperwork when he

was transferred from that facility to the Huntingdon County courthouse for his

jury selection and trial, which items were needed for him and his counsel to

be sufficiently prepared." Hooper's Brief at 15 (footnote and unnecessary

capitalization omitted).[3]  Hooper claims that he was not prepared to fully defend against the underlying charges, including how he would testify at trial, such that under duress, he opted against testifying at trial because of this lack of preparedness.  On this basis, Hooper contends that the denial of his continuance request violated his right to due process under the Fifth and Sixth Amendments of the United States Constitution as applied to the Commonwealth of Pennsylvania through the Fourteenth Amendment.  Hooper insists that, had the trial court granted his continuance request, he would have been able to: (1) obtain a transcript of M.M.'s interview at the Child Advocacy Center ("CAC"); (2) juxtapose that unsworn testimony with M.M.'s sworn testimony at a prior hearing; (3) compare these items with his written pretrial discovery; and (4) utilize his own notes that were left behind at the CCCF. *See* Hooper's Brief at 38.  Hooper further claims that, because he was not permitted to bring these items to trial, and did not have time to sufficiently meet with defense counsel to adequately prepare for trial, he was "coerced" not to testify at trial.  *Id*.  Hooper argues that, if he had been permitted to sufficiently prepare for trial with his paperwork, he would have been able to highlight the inconsistencies in M.M.'s testimony which would have disproven

---

[3] The trial court explained that because the Huntingdon County jail only has the capacity to hold forty-eight inmates, Huntingdon County arrestees and convicted inmates are frequently housed at the CCCF.  *See* Trial Court Opinion, 1/15/25, at 15 n.1.

her allegations and warranted a "false in one, false in all" instruction to the jury. *Id*. at 39.

The trial court considered Hooper's first issue and concluded that it lacked merit. The court reasoned:

> [Hooper] made his request for a continuance not only on the "eve of trial," but the morning of trial, just as trial was about to commence. It was made verbally at jury selection and focused on arguments that [Hooper] attempted to make *ex parte* in a letter he sent to the undersigned judge on January 21, 2024, which is in the record as Exhibit "A" to [Hooper's] post-sentence motions filed July 8, 2024.

> Jury selection in this matter had previously been set for January 8, 2024. When that date arrived, however, [Hooper] refused to leave his cell at the [CCCF] in order to be transported to the Huntingdon County courthouse. As a result, this court continued the matter and rescheduled jury selection for March 4, 2024. In addition, the court was working to schedule jury trials in all matters with a looming deadline of April 16, 2024—the date this court lost access to both of its courtrooms so that construction for a year-long renovation project could begin. While jury trials have continued during such renovation project, space for them is very limited, and the court took measures to hold as many trials as possible before the April deadline (including scheduling additional trial terms) in order to protect the speedy trial rights of defendants in then-pending cases.

> Looking to [Hooper's] post-sentence motions, he claims that the following materials were left behind at CCCF on the morning of trial, which rendered him unable to do the following:

>> a). a transcript of [M.M.'s] interview conducted by James Stefanee at the Cambria County [CAC] dated September 16, 2022;

>> b). juxtapose [M.M.'s] unsworn statements at the CAC with her sworn prior testimony at the hearing on the petition for writ of *habeas corpus* dated August 3, 2023; and

c). compare these items with the contents of his written pre[]trial discovery, which production was forty-eight . . . pages in length, which was never provided to him.

[Hooper's] Post-Sentence Motions, [7/8/24], at 125 (text as in the original, including formatting). [Hooper] further claim[ed] in his post-sentence motions that because he was not provided with the items identified above prior to trial, and did not have adequate time to meet with trial counsel to prepare for trial, his decision not to testify at trial was "coerced." *Id*. at 126. He argues that if he had been given more time to prepare with trial counsel using the above materials, he would have been able to "highlight inconsistencies in [M.M.'s] version of events and her supporting deals [*sic*], which would have disproven their alleged occurrences," and that at the very least, the inconsistencies would have allowed him to obtain a "false in one, false in all" instruction for the jury. *Id*. at 1127-28.

The court notes that the above claims track [Hooper's] attempted *ex parte* letter to the undersigned judge sent after he refused to appear for jury selection on January 8, 2024 (which the court reiterates it did not read until after trial, when it was filed as an exhibit to [Hooper's] post-sentence motions). In that letter, [Hooper] attempts to explain away his refusal to appear for jury selection on the basis that he was unprepared for trial due to defense counsel not having met with him often enough or for long enough, not having allowed him to review discovery materials such as the video of the CAC interview enough times, and not having given him full and unfettered access to other discovery materials (such as transcripts). He then goes on a tangent regarding inadmissible facts and allegations that he thinks prove that M.M. is lying.

In sum, what this court was faced with on the morning of trial was a defendant who was seeking any avenue he could think of to prevent the Commonwealth from bringing him to trial on the facts of the case, as opposed to the facts that he wanted to be tried on, and who was seeking to delay trial inappropriately in furtherance of that strategy. He was making a backhanded argument for ineffective assistance of counsel based on lack of preparation when what he was really disputing was trial strategy. He was seeking to force defense counsel to adopt his desired arguments without requesting replacement counsel from this court. And[,] he was attempting to avoid meaningfully

- 11 -

participating in the trial process instead of raising his issues properly. All of this was presented against the backdrop of a trial that had already been delayed due to [Hooper's] inappropriate actions and which would be subject to additional, extensive delays once construction began on the courthouse renovation. Considering all of the preceding, it is beyond peradventure that this court properly denied [Hooper's] last-minute continuance request.

Trial Court Opinion, 1/15/25, at 12-14 (footnote and unnecessary capitalization omitted).

Based on our review, we discern no abuse of discretion by the trial court in denying Hooper's last-minute request for a continuance. Hooper concedes that "[b]etween September 28, 2023 and January 8, 2024, jury selection was continued on two (2) occasions." Hooper's Brief at 14. Trial was continued on January 8, 2024, due to Hooper's refusal to leave his jail cell, necessitating that the trial to be continued to March 4, 2024. Hooper has not shown how the trial court's refusal to grant yet another continuance was the result of partiality, prejudice, bias, or ill-will as shown by the evidence or the record. *See Griffin*, 804 A.2d at. 12. Nor has Hooper demonstrated prejudice as a result of the trial court's ruling. Indeed, the trial court noted that defense counsel extensively cross-examined M.M. regarding inconsistencies in her testimony and conflicts between her testimony and other evidence in the record, noting:

> The overall approach of the defense was to try to cast doubt on the veracity of M.M.'s testimony, arguing that a host of factors rendered it unbelievable. Defense counsel sought highly specific details that M.M. could not recall or provide, such as the make and model of the car that [Hooper] drove her to the garage in, and

whether the car belonged to him to someone else. Defense counsel identified and called out an inconsistency in M.M.'s testimony regarding that assault, in that when M.M. testified at the August 3, 2023, *habeas corpus* hearing, she said that she was originally sitting in the back seat of the car and [Hooper] was sitting on the "spinning chair," versus her testimony at trial which placed [Hooper] the car [*sic*] and herself on the chair. Defense counsel argued that the first assault could not have occurred when M.M. testified that it did, as baseball is not played when it is cold outside.

Most significantly, defense counsel attacked the timing of the second and third assaults testified to by M.M. based on incongruities between M.M.'s testimony and other evidence. Specifically, M.M. testified on direct examination that December 27, 2012—the day that [Hooper] assaulted Grandmother—was the last time she had seen [Hooper]. On cross-examination, defense counsel got M.M. to agree that she had only ever been to the garage that [Hooper] worked at one time. *Id*. at 32. Defense counsel then tried to get M.M. to agree that the date she had been at the garage was also December 27, 2012, but M.M. could not confirm this. *Id*. at 36-37, 38. Finally, defense counsel presented M.M. with Defense Exhibit 1, which is a picture of M.M. and Defendant sitting on a couch together, both holding guitars, with a timestamp of "2013/12/16 06:16." M.M. believed that her father had taken the picture and that it was taken around Christmas, but she did not recall what date it was taken, and had no idea why the timestamp indicated it was taken nearly a year after the last date she saw [Hooper]. *Id*. at 38-42.

Trial Court Opinion, 1/15/25, at 6-7 (footnotes and unnecessary capitalization omitted).

Based on defense counsel's extensive cross-examination of M.M., the record does not support a finding that Hooper was prejudiced or that his personal papers "were needed for him and his counsel to be sufficiently prepared." Hooper's Brief at 15. Instead, the record reflects that defense counsel was aware of the various inconsistencies in M.M.'s testimony and did,

- 13 -

in fact, cross-examine her regarding those inconsistencies. Notably, Hooper has not identified any information in the paperwork he left in prison that was unknown to counsel or would have changed counsel's cross-examination of M.M.

We additionally find no support in the record for Hooper's contention that he was "coerced" to give up his right to testify in his own defense as a result of the trial court's denial of his request for another continuance. Hooper could have exercised his right to testify when the defense presented its case. That Hooper ultimately chose not to exercise his right to testify simply cannot be regarded as coercion by the trial court. Instead, on the record before us, it appears to have been a matter of trial strategy. Accordingly, Hooper's first issue merits no relief.

In his second issue, Hooper contends that the trial court erred in refusing to issue a limiting or cautionary instruction after the prosecution referenced in its closing argument statistical studies which were never presented at trial. Preliminarily, we must determine whether Hooper preserved this issue for our review. In order to preserve an objection for appellate review, the defendant is required to make a timely and specific objection in the trial court. *See Commonwealth v. Edmondson*, 718 A.2d 751, 753 (Pa. 1998). Requiring a timely, specific objection to be lodged in the trial court ensures that the trial judge has a chance to correct alleged trial errors and eliminates the possibility that the appellate court will be required

to expend time and energy reviewing points on which no trial ruling has been made. *See id*.

Here, the record reflects that Hooper failed to make a timely or specific objection to the prosecutor's comments at the time they were made. *See* N.T., 3/7/24, at 5-6. Instead, defense counsel waited until after the jury had been instructed and was engaged in its deliberations before making an objection. *See id*. at 83. By that point in time, the trial court was no longer in a position to address this alleged error. Thus, Hooper's belated objection deprived the trial court of any chance to correct the perceived error. *See Edmondson*, 718 A.2d at 753.

Moreover, the record is clear that, when defense counsel eventually lodged an objection to the prosecutor's comments, counsel did not request a limiting or curative instruction. *See id*. Accordingly, the issue is waived, and this Court need not expend time and energy reviewing an issue on which no trial ruling has been made. *See Edmondson*, 718 A.2d at 753; *see also* Pa.R.A.P. 302(a) (providing that issues not raised in the trial court are waived and may not be raised for the first time on appeal).

In his third issue, Hooper contends that the jury's verdict of guilt was against the weight of the evidence. As our Supreme Court has explained:

> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion

of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice."

*Commonwealth v. Widmer*, 744 A.2d 745, 751-52 (Pa. 2000) (citations and footnote omitted). "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa. Super. 2015) (brackets and citation omitted). Thus, in order for a defendant to prevail on a challenge to the weight of the evidence, "the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the trial court." *Id*. at 546 (citation omitted).

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence*. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the

> weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (citations omitted, emphasis in original).

Hooper concedes that M.M.'s testimony, by itself, is sufficient to establish the requisite elements of his convictions. Nonetheless, he argues that her testimony, when viewed in its entirety, shocks one's sense of justice. In advancing this argument, Hooper points to the fact that there were no corroborating witnesses, no supporting contemporaneous evidence, and no confirming medical evidence. While Hooper acknowledges that no such corroborating testimony or evidence was necessary to establish his guilt, he contends that their absence weakened the overall strength of the prosecution's case.

Hooper additionally claims that M.M.'s testimony that the first incident happened near her August birthday during baseball season, when it was too cold for her to play outside, was implausible. Regarding the second assault, Hooper queries how he could have been actively working on an automobile when M.M. arrived if they had been together dining out. According to Hooper, it would defy the laws of physics for a diesel truck to be placed onto a hydraulic lift, which makes an assault on the backseat of a car that he was reportedly working on an impossibility. With respect to the third assault, Hooper points to M.M.'s testimony that Hooper did not give her any underwear, yet she somehow arose the next morning to find blood in her underwear, which was

never discovered by anyone who laundered her clothing.  Hooper additionally questions how the third assault could have happened when there was no allegation that anything sexual occurred after December 27, 2012, subsequent to Hooper being charged with simple assault against Grandmother.  Finally, Hooper claims that M.M. had a motive to fabricate her allegations against him in light of his past threats to M.M. and Grandmother that he would burn down the house with M.M. in it.

The trial court considered Hooper's challenge to the weight of the evidence and determined that it lacked merit.[4]  The court reasoned:

> Turning to the weight of the evidence standard, it is clear that what [Hooper] is actually seeking is a reassessment of M.M.'s credibility, and that what he is actually arguing is that the jury should have viewed her testimony in his preferred manner.  But under the controlling law and the core tenets of our justice system this is neither permissible nor an appropriate subject for appeal.  It was solely within the province of the jury to assess M.M.'s credibility and the strength and weight of her testimony. The jury properly did so here.
>
> * * * *
>
> M.M. testified that she could not pinpoint the dates and times that each sexual assault occurred, beyond that they each occurred between her fifth birthday and December 27, 2012, and that she could be mistaken in her recollections regarding timing. Thus, the precise timing of the assaults (other than within the

_____

[4] Based on the inartful phrasing of this issue in Hooper's concise statement, the trial court believed that he was attempting to challenge both the sufficiency and weight of the evidence.  **See** Trial Court Opinion, 1/15/25, at 20 (concluding that "[Hooper] appears to be attempting to assert both a sufficiency of the evidence challenge and a weight of the evidence challenge"). However, Hooper's appellate brief makes clear that he is challenging only the weight of the evidence supporting the verdicts.

stated window of time) and order of events was not a core element of the offenses. In other words, the jury was free to interpret M.M.'s testimony as being mistaken regarding whether the assaults occurred in the order she described them, such as whether the incident at the garage actually occurred before or after the incident where M.M. spent the night with [Hooper].

[Hooper] claims that it was somehow proven that the second incident described by M.M., which occurred at the garage, occurred on December 27, 2012, and that this means the third incident could not have occurred since M.M. also said that date was the last time that she saw [Hooper]. But[,] this is not the case. M.M, specifically testified that she did not know what date the assault at the garage occurred, and her statement that the assault occurred the one time that she was at the garage with [Hooper] was not volitional. That is, it was not made during her testimony on direct examination, when she was recalling the incident specifically, but rather during the course of rapid[-]fire questioning on cross-examination. The jury could therefore reasonably conclude that M.M. was either mistaken about having been to the garage only one time, or was confused by defense counsel's question, and instead actually meant that it was the one time that [Hooper] took her into the garage to assault her. Regardless, since the precise sequence of the three assaults is not a core element of the offenses, and M.M. admitted that she could have gotten that aspect wrong, it does not render her testimony regarding the second and third incidents unworthy of belief.

As a general matter, M.M.'s recollections were entirely consistent with those of a child between the ages of five and seven years of age, in that certain aspects remained clear in her mind (*e.g.*, the assault at the garage occurring in the back of a car) while aspects that were not central to the incidents were forgotten or hazy (*e.g.*, the precise color, make, and model of the car, or who owned it).

In particular, the timestamp on Defendant's Exhibit 1, the picture of [Hooper] and M.M., does not disprove M.M.'s testimony. She did not take the picture, could not remember precisely when it was taken, and had no knowledge of whether the timestamp was accurate. It is common knowledge that many digital cameras require the user to set the time and date correctly in order for the timestamp to be accurate, and that timestamps

can be inaccurate. Further, M.M.'s testimony regarding the picture—that it was taken around Christmas—is consistent with the year of the timestamp being inaccurate (*i.e.*, it could have been taken on December 26, 2012, as opposed to December 26, 2013).

Trial Court Opinion, 1/15/25, at 20-22 (unnecessary capitalization omitted).

Based on our review, we discern no abuse of discretion by the trial court in denying Hooper's challenge to the weight of the evidence. As explained above, this Court will give the gravest consideration to the findings and reasons advanced by the trial court judge when reviewing its determination as to whether the verdict is against the weight of the evidence. *See Clay*, 64 A.3d at 1055. Moreover, one of the least assailable reasons for denying a new trial is the lower court's conviction that the verdict was not against the weight of the evidence. *See id.*

Here, Hooper is essentially asking this Court to reweigh the evidence to accord no weight to M.M.'s testimony. This, we cannot do. *See Talbert*, 129 A.3d at 545 (holding that the weight to be accorded to the evidence and testimony presented at trial was exclusively for the fact-finder, which was free to believe all, part, or none of the evidence and testimony and to determine credibility). Rather, this Court's role is to review the exercise of discretion by the trial court in ruling on the weight claim. *See Clay*, 64 A.3d at 1055. In this regard, we discern no abuse of such discretion.

Importantly, we note that the trial court judge determined that Hooper's guilty verdicts were not against the weight of the evidence. Moreover, the

trial court heard all of M.M.'s testimony and determined that it was entirely consistent with her recollection of events that occurred when she was a child between the ages of five and seven years of age. Further, the trial court recognized that M.M. admitted that she could have gotten specific dates and certain details wrong, and the court concluded that such mistakes did not render her testimony unworthy of belief by the jury. On this record, we discern no abuse of discretion by the trial court in denying Hooper's weight challenge. Accordingly, his third issue merits no relief.

In his final issue, Hooper contends that he should have been afforded funds to retain an expert to oppose the SOAB member's finding that he is an SVP.[5] The appointment of an expert witness in criminal matters is "vested in the sound discretion" of the trial court. ***Commonwealth v. Cannon***, 954 A.2d 1222, 1226 (Pa. Super. 2008). The decision to deny funds to hire an expert witness to assist in a defendant's defense against criminal charges will not be overturned absent abuse of discretion. ***Id***.

The Commonwealth is not obligated to pay for the services of an expert simply because a defendant requests one. ***See Commonwealth v. Carter***, 643 A.2d 61, 73 (Pa. 1994). There must be some showing as to the content

_____

[5] Hooper appears to believe that this issue implicates the discretionary aspects of his sentence. ***See*** Hooper's Brief at 5. However, it does not. Moreover, following the trial court's resentencing of Hooper on October 4, 2024, Hooper did not file a post-sentence motion challenging the discretionary aspects of his sentence. Thus, any discretionary sentencing challenge is waived.

and relevancy of the proposed expert testimony before such a request will be granted. *See Commonwealth v*. *Bell*, 706 A.2d 855, 862 (Pa. Super. 1998). An indigent defendant subject to an SVP hearing under the provisions of SORNA has a procedural due process right to a court-appointed psychological expert. *See Commonwealth v. Curnutte*, 871 A.2d 839, 843 (Pa. Super. 2005) (holding that an indigent defendant is entitled to an expert assessment other than that conducted by the SOAB, and the appointment of an expert witnesses at an SVP hearing).

Hooper claims that, based on the SOAB member's report, the trial court was "required" to allot funding for him to obtain a counter expert report. Hooper's Brief at 53. Hooper maintains that an indigent defendant, who is subject to an SVP hearing under the provisions of SORNA, is entitled to a court-appointed psychological expert, which opportunity was not meaningfully afforded to Hooper because the SOAB report was belatedly presented to his attorney as part of a pre-sentence investigative report in violation of due process, which triggered Hooper's need to obtain a counter-expert report. Hooper posits that, if he had been able to have an expert conduct an independent forensic psychological evaluation and assessment, it may have resulted in a lesser minimum sentence, a lesser maximum sentence, and possibly concurrent sentences being imposed. Hooper argues that this failure was not cured by the trial court's imposition of a standard range sentence when he was resentenced.

The trial court considered Hooper's final issue and determined that it lacked merit. The court reasoned:

> As the court made clear at [Hooper's] resentencing hearing, the court neither read the report of the SOAB that found [him] to be a sexually violent offender nor made any finding in this regard, because the Commonwealth did not petition for such a finding to be made. Thus, [Hooper] has no basis on which to contest the findings of the SOAB[,] nor to request the assistance of an expert to do so.

Trial Court Opinion, 1/15/25, at 22-23 (unnecessary capitalization omitted).

Based on our review, we discern no abuse of discretion by the trial court in failing to appoint an expert witness for Hooper to oppose the SOAB member's finding that he is an SVP. As explained above, the Commonwealth did not request an SVP determination. Thus, the trial court did not schedule or hold an SVP hearing and made no finding or determination as to whether Hooper is an SVP. As noted by the trial court, it never read the SOAB report, as it had no reason to do so. Consequently, because there was no SVP hearing or SVP determination in this matter, Hooper was not entitled to the appointment of a defense expert. Accordingly, his final issue merits no relief.

Judgment of sentence affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>07/08/2025</u>